IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

```
ANNETTE GIBBS,                *
                              *
        Plaintiff,            *      CIVIL ACTION NO. 15-00041-B
                              *
vs.                           *
                              *
CAROLYN W. COLVIN,            *
Commissioner of Social        *
Security,                     *
                              *
        Defendant.            *
```

**ORDER**

Plaintiff Annette Gibbs (hereinafter "Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security denying her claim for a period of disability and disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401, *et seq*.  On October 12, 2015, the parties consented to have the undersigned conduct any and all proceedings in this case.  (Doc. 19).  Thus, the action was referred to the undersigned to conduct all proceedings and order the entry of judgment in accordance with 28 U.S.C. § 636(c) and Federal Rule of Civil Procedure 73.  Upon careful consideration of the administrative record and the memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner be **AFFIRMED**.

I.  **Procedural History**

Plaintiff filed her application for benefits on July 19,

2011.  (Tr. 143).  Plaintiff alleged that she has been disabled since November 10, 2010, due to right knee pain/surgery, left knee pain and arthritis, left ankle arthritis, bone spurs at left heel, acid reflux, swelling in both knees and left ankle, too much pressure on left leg, memory problems, learning disability, and poor concentration.  (Id. at 178, 182).

Plaintiff's applications were denied and upon timely request, she was granted an administrative hearing before Administrative Law Judge Ricky V. South (hereinafter "ALJ") on March 25, 2013.  (Id. at 31).  Plaintiff attended the hearing with her counsel and provided testimony related to her claims. (Id. at 36).  A vocational expert ("VE") also appeared at the hearing and provided testimony.  (Id. at 59).  On May 23, 2013, the ALJ issued an unfavorable decision finding that Plaintiff is not disabled.  (Id. at 26).  The Appeals Council denied Plaintiff's request for review on December 9, 2014.  (Id. at 1-2).  Therefore, the ALJ's decision dated May 23, 2013, became the final decision of the Commissioner.

Having exhausted her administrative remedies, Plaintiff timely filed the present civil action.  (Doc. 1).  The parties waived oral argument on October 12, 2015 (Doc. 18), and agree that this case is now ripe for judicial review and is properly before this Court pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

## II.  Issues on Appeal

> 1.  **Whether the ALJ erred in failing to consider the opinions of treating physician, Dr. Judy C. Travis, M.D., dated May 14, 2013?**
>
> 2.  **Whether the Appeals Council erred in failing to consider medical records submitted by Plaintiff based on the dates of the treatment?**

## III. Factual Background

Plaintiff was born on May 2, 1964, and was forty-eight years of age at the time of her administrative hearing on March 25, 2013. (Tr. 31, 36). Plaintiff graduated from high school in 1982 and last worked from February 2010 to November 2010 as a sales clerk at a clothing store. (Id. at 49-50, 184, 224). Plaintiff also worked as a cook in a school cafeteria and as a fast food worker in various restaurants from 2002 to May 2010.[1] (Id. at 184, 214).

At her hearing, Plaintiff testified that her biggest problem is pain in her right knee, which she described as a seven on a ten-point pain scale, after medication. (Id. at 38, 44). Plaintiff stated that she stopped working on November 10, 2010, because she "wasn't able to climb up steps or stand up long or get on [her] knees or squat down." (Id. at 50). Plaintiff testified that she cannot work now because she cannot

---

[1] The exact dates of Plaintiff's employment as a cook/kitchen worker are unclear from the record. (Tr. 214).

stand or walk for long periods of time and cannot climb or get down on the floor.  (Id. at 50-51).  Plaintiff testified that she has had two surgeries on her right knee (the second one being only four months before her hearing), but that the surgeries did not help the pain.  (Id. at 38, 42).  She has trouble going up and down steps and has fallen once.  (Id. at 39).  According to Plaintiff, she has severe degenerative arthritis in her right knee and degenerative arthritis in her left knee.  (Id. at 56).  Her medications include Norco (for pain), Lovenox (anticoagulant/blood thinner), iron tablets (for anemia), and Aleve, and she has no side effects from her medication.  (Id. at 43-44, 259).

In her Function Report submitted to the Agency, Plaintiff stated that she cannot stand or walk for a long period of time; she cannot bend; she cannot step up with her right leg; and she cannot kneel on her right knee.  (Id. at 205).  She uses a cane for walking.  (Id. at 42).  She testified that she can lift/carry two gallons of milk;[2] she can stand about fifteen minutes; she can walk about ten minutes; and she can sit about twenty minutes.  (Id. at 52-53).  She cannot bend, squat, kneel, or crawl, but she can reach overhead with both arms and can grip with her hands.  (Id. at 53-54).  Plaintiff has a driver's

---

[2] In her Function Report, Plaintiff reported to the Agency that she can lift twenty pounds.  (Tr. 209).

4

license, but she has not driven since her surgery in November 2012.[3]  (Id. at 40).

Plaintiff testified that she is married and has one son who is twenty-four years old.  (Id. at 38-39).  She reported that her routine consists of getting up in the morning, getting ready for work, going to work,[4] getting home, sometimes cooking, and going to bed.  (Id. at 202).  Plaintiff reported that she takes care of her husband and does the cooking, and she takes care of their pets.  (Id. at 205).  She prepares meals every other day for her family, which takes one to two hours.  (Id. at 206).  She irons sitting down, washes clothes, and does the dishes.  (Id.).  She can take care of her own personal needs but has to sit down to bathe, dress, and do her hair.  (Id. at 205).  She needs no reminders to take care of her personal needs or to take her medicine.  (Id. at 206).  Plaintiff shops and can handle her own finances.  (Id. at 207).  She socializes on the telephone and goes to church regularly.  She stated that she needs no reminders about going places, but she needs someone to accompany her when she goes out.  (Id. at 40, 208).  She has no problems getting along with family, friends, or neighbors.  (Id. at 209).

_____

[3] Prior to her surgery in November 2012, Plaintiff drove regularly.  (Tr. 207).

[4] The ALJ found that Plaintiff's work after her onset date of November 10, 2010, did not constitute substantial gainful activity.  (Tr. 16, 36).

She can pay attention "at all time[s];" she finishes what she starts and can follow spoken instructions "good," but she has trouble with written instructions. (Id.). She gets along "good" with authority figures and has never been fired from a job because of problems getting along with people. (Id. at 210). She handles stress and changes in routine "pretty good." (Id.).

## IV.  Analysis

### A.  Standard of Review

In reviewing claims brought under the Act, this Court's role is a limited one. The Court's review is limited to determining 1) whether the decision of the Secretary is supported by substantial evidence and 2) whether the correct legal standards were applied.[5] Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990). A court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986). The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence. Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991); Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (holding substantial evidence is defined as "more than a scintilla, but

---

[5] This Court's review of the Commissioner's application of legal principles is plenary. Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

less than a preponderance" and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion."). In determining whether substantial evidence exists, a court must view the record as a whole, taking into account evidence favorable, as well as unfavorable, to the Commissioner's decision. Chester v. Bowen, 792 F. 2d 129, 131 (11th Cir. 1986); Short v. Apfel, 1999 U.S. Dist. LEXIS 10163, *4 (S.D. Ala. June 14, 1999).

**B.  Discussion**

An individual who applies for Social Security disability benefits must prove his or her disability. 20 C.F.R. §§ 404.1512, 416.912. Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); see also 20 C.F.R. §§ 404.1505(a), 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven his disability.[6] 20 C.F.R.

---

[6] The claimant must first prove that he or she has not engaged in substantial gainful activity. The second step requires the claimant to prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is

§§ 404.1520, 416.920.

In the case *sub judice*, the ALJ determined that Plaintiff has not engaged in substantial gainful activity since November 10, 2010, the alleged onset date, and that she has the severe impairment of osteoarthritis. (Tr. 16). The ALJ further found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals any of the listed impairments contained in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Id.).

The ALJ concluded that Plaintiff retains the residual functional capacity (hereinafter "RFC") to perform a range of light work, except that Plaintiff can "lift/carry 20 pounds

---

automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove an inability to perform their past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; and (4) the claimant's age, education and work history. Id. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity, age, education, and work history. Sryock v. Heckler, 764 F.2d 834, 836 (11th Cir. 1985). If the Commissioner can demonstrate that there are such jobs the claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled. Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

occasionally and 10 pounds frequently; sit/stand at will; occasionally bend, balance, stoop, kneel, crouch and crawl; never climb ladders, ropes or scaffolds; avoid concentrated exposure to cold, heat, wetness, humidity, pulmonary irritants, fumes, odors, dust, and gases; and avoid all exposure to hazardous conditions such as unprotected heights, dangerous machinery and uneven surfaces. The claimant would have the following mental limitations: no more than simple, short instructions and simple work related decisions with few work place changes (unskilled work); only simple, work-related decisions with few work place changes (low stress); occasional interaction with the general public, supervisors, and co-workers; and she is unable to work in close proximity to others-easily distracted." (Id. at 17). The ALJ also determined that while Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of the alleged symptoms were only partially credible for the reasons explained in the decision. (Id. at 23).

Given the Plaintiff's RFC and her non-exertional limitations, the ALJ found that Plaintiff is not capable of performing her past relevant work as a cashier (light/unskilled), fast food worker (light/unskilled), or salad bar attendant (light/semiskilled). (Id. at 24, 62). However,

utilizing the testimony of a VE, the ALJ concluded that considering Plaintiff's residual functional capacity for a range of light work, as well as her age, education and work experience, there are jobs existing in the national economy that Plaintiff is able to perform, such as "garment sorter," "garment folder," and "hand finisher," all of which are classified as light and unskilled. (Id. at 17, 25, 62). Thus, the ALJ concluded that Plaintiff is not disabled. (Id. at 26).

The Court now considers the foregoing in light of the record in this case and the issues on appeal.

1.   **Issues**

A.  **Whether the ALJ erred in failing to consider the opinions of treating physician, Dr. Judy C. Travis, M.D., dated May 14, 2013?**

In this case, Plaintiff argues that the ALJ erred in failing to consider the opinions of her treating physician, Dr. Judy C. Travis, M.D., set forth in a second set of Medical Source Statement ("MSS") and Clinical Assessment of Pain ("CAP") forms completed on May 14, 2013. Included in the forms is Dr. Travis' opinion that Plaintiff is unable to maintain gainful employment as a result of her pain. (Doc. 14 at 2; Tr. 352-53, 378-79). The Commissioner counters that the ALJ's failure to consider the second set of MSS and CAP forms is harmless because the ALJ did consider the first set of MSS and CAP forms

completed by Dr. Travis on July 18, 2012.  In the earlier forms, Dr. Travis likewise opined that Plaintiff is unable to maintain gainful employment as a result of her pain.  The Commissioner maintains that Dr. Travis' second set of opinions are essentially redundant of the first set, which were properly rejected by the ALJ because they are inconsistent with the substantial evidence in the case.  (Doc. 16 at 7-10; Tr. 352-53, 378-79).  Having carefully reviewed the record in this case, the Court agrees that Plaintiff's claim is without merit.

    As part of the disability determination process, the ALJ is tasked with weighing the opinions and findings of treating, examining, and non-examining physicians.  In reaching a decision, the ALJ must specify the weight given to different medical opinions and the reasons for doing so.  See Winschel v. Commissioner of Soc. Sec., 631 F.3d 1176, 1179 (11th Cir. 2011). The failure to do so is reversible error.  See Williams v. Astrue, 2009 U.S. Dist. LEXIS 12010, *4, 2009 WL 413541, *1 (M.D. Fla. 2009).

    When weighing the opinion of a treating physician, the ALJ must give the opinions "substantial weight," unless good cause exists for not doing so.  Costigan v. Commissioner, Soc. Sec. Admin., 2015 U.S. App. LEXIS 2827, *10, 2015 WL 795089, *4 (11th Cir. Feb. 26, 2015) (citing Crawford v. Commissioner of Soc. Sec., 363 F.3d 1155, 1160 (11th Cir. 2004) and Broughton v.

Heckler, 776 F.2d 960, 962 (11th Cir. 1985)).  The opinion of "a one-time examining physician — or psychologist," on the other hand, is not entitled to the same deference as a treating physician.  Petty v. Astrue, 2010 U.S. Dist. LEXIS 24516, *50, 2010 WL 989605, *14 (N.D. Fla. Feb. 18, 2010) (citing Crawford, 363 F.3d at 1160).  An ALJ is also "required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists who are also experts in Social Security disability evaluation.'"  Milner v. Barnhart,  275 Fed. Appx. 947, 948 (11th Cir. 2008) (unpublished) (citing 20 C.F.R. § 404.1527(f)(2)(i)).  "The ALJ may rely on opinions of non-examining sources when they do not conflict with those of examining sources."  Id. (citing Edwards v. Sullivan, 937 F.2d 580, 584-85 (11th Cir. 1991)).

Whether considering the opinions of treating, examining, or non-examining physicians, good cause exists to discredit the testimony of *any* medical source when it is contrary to or unsupported by the evidence of record.  Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004).  "Good cause may also exist where a doctor's opinions are merely conclusory, inconsistent with the doctor's medical records, or unsupported by objective medical evidence."  Hogan v. Astrue, 2012 U.S. Dist. LEXIS 108512, *8, 2012 WL 3155570, *3 (M.D. Ala. 2012).

The ALJ is "free to reject the opinion of any physician when the evidence supports a contrary conclusion." Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (citation omitted); Adamo v. Commissioner of Soc. Sec., 365 Fed. Appx. 209, 212 (11th Cir. 2010) (The ALJ may reject any medical opinion if the evidence supports a contrary finding.).

In the present case, the record shows that Plaintiff was treated intermittently by Dr. Travis from June 8, 2010, to May 14, 2013, primarily for leg, knee, and foot pain.[7] (Tr. 349-50, 352-53, 378-79, 381, 384, 390). Dr. Travis' notes are sparse but indicate that Plaintiff's pain was treated conservatively with anti-inflammatories and pain medications. (Id. at 300, 349-50).

On November 6, 2010, Plaintiff saw an orthopedist, Dr. Anthony L. Tropeano, M.D., who diagnosed her with a right knee medial meniscal tear, chondromalacia, osteoarthritis, a chronic ACL tear, and synovitis. (Id. at 299-300). Dr. Tropeano advised Plaintiff of her treatment options, and she elected to proceed with a right knee arthroscopy on November 16, 2010. (Id. at 299-300). On January 17, 2011, two months after her surgery, Dr. Tropeano noted that Plaintiff was "doing well."

---

[7] Dr. Travis treated Plaintiff once in 2010, three times in 2012, and three times in 2013. (Tr. 349-50, 352-53, 378-79, 381, 384, 387, 390).

(Id. at 313).   His notes reflect that Plaintiff still had a "little bit of a limp" and that her physical therapy had been delayed because she had a family emergency over the holidays. (Id.).   Plaintiff reported that she was "able to do most of the things she wants," except bending and standing for long periods of time.   (Id.).   Plaintiff also reported that she was "ready to get back to work," and Dr. Tropeano released her to light work with no prolonged standing, bending, or squatting.   (Id.).   On February 21, 2011, three months post surgery, Plaintiff reported to Dr. Tropeano that she was still having pain with her right knee but was getting better.   (Id. at 312).   Dr. Tropeano gave Plaintiff a Supartz injection and noted that she tolerated it well.   (Id. at 312).   He instructed Plaintiff to return in the following weeks for the two remaining injections in the Supartz series.   (Id.).

On July 22, 2011, eight months post surgery, Dr. Tropeano noted that Plaintiff had completed the Supartz injections and still complained of pain in her right knee and left ankle.   (Id. at 309).   Dr. Tropeano's examination revealed no swelling of the right knee, some tenderness, and 0 to 110 degrees of range of motion.   (Id.).   He did not recommend further surgery on her knee at that time.   (Id.).   Dr. Tropeano noted tenderness and reduced range of motion in Plaintiff's left ankle as well. (Id.).   X-rays of Plaintiff's left ankle revealed anterior

spurring but no fracture, dislocation, or bony pathology. (Id.).  Dr. Tropeano gave Plaintiff a steroid injection in her knee, which she tolerated well, and ordered physical therapy for her ankle.  (Id.).  He instructed Plaintiff to return in a few weeks, but the record reflects that Plaintiff did not return to Dr. Tropeano.

Plaintiff filed her application for disability benefits on July 19, 2011.  (Id. at 143).  On October 3, 2011, Plaintiff was examined at the request of the Agency by Dr. Stephen J. Robidoux, M.D.  (Id. at 318-21).  Dr. Robidoux noted that Plaintiff presented with complaints of arthritis pain in her knees and feet.  (Id. at 318).  Upon examination, Dr. Robidoux noted that Plaintiff had a "normal unaided gait," normal range of motion in all upper and lower extremities, no muscle atrophy or weakness, was able to squat and raise half way, and had normal heel and toe walking.  (Id. at 319-20).  Dr. Robidoux diagnosed Plaintiff with poor arches in her feet and advised her to wear shoes with good arch support.  (Id.).  He also diagnosed her with degenerative arthritis.  (Id.).  Dr. Robidoux noted that Plaintiff had recently had arthroscopic surgery on her right knee (without a knee replacement) and that it "ha[d] required no recent follow up."  (Id.).  Dr. Robidoux advised Plaintiff that she could benefit from weight reduction for her knees and feet.  (Id.).  He found no limitations for sitting,

standing, walking, climbing, lifting, carrying, using hand and foot controls, handling objects, talking, listening, or travel. (Id.).

Following her initial visit to Dr. Travis in 2010, Plaintiff returned to Dr. Travis on February 13, 2012, and March 13, 2012, with complaints of knee and bilateral foot pain, for which Dr. Travis prescribed anti-inflammatory and pain medications. (Id. at 349). On July 11, 2012, Plaintiff's attorney wrote a letter to Dr. Travis requesting that she complete Clinical Assessment of Pain ("CAP") and Medical Source Statement ("MSS") forms for Plaintiff. (Id. at 351).

On July 18, 2012, Dr. Travis completed the forms, opining in the CAP form that Plaintiff's pain is present to such an extent as to be distracting to the adequate performance of daily activities, that physical activity will increase pain to such an extent that bed rest and/or medication will be necessary, and that significant side effects from her medication may be expected to limit effectiveness of work duties. (Id. at 352). In addition, Dr. Travis opined in the MSS (physical) form that Plaintiff could sit for only four hours in an eight hour work day, could stand/walk for less than one hour a day, could occasionally lift/carry ten pounds, could frequently lift/carry one pound, could rarely bend or stoop, and could never work around hazardous machinery. (Id. at 353). Dr. Travis opined,

however, that Plaintiff could frequently perform gross manipulation and occasionally push/pull with arms and legs, balance, climb, perform fine manipulation, reach overhead, and operate motor vehicles. (Id.). She also opined that Plaintiff would be absent from work more than three times a month. (Id.).

The following day, July 19, 2012, Plaintiff presented to Dr. Travis for a "pain assessment requested by lawyer." (Id. at 390). Upon examination, Dr. Travis noted that Plaintiff complained of right knee, left ankle, and left foot pain but had "[f]ull range of motion of all joints;" "[a]ll muscles [were] functioning well;" and "[n]o atrophy [was] noted." (Id.). Dr. Travis did note that Plaintiff had popping in the right knee with extension. (Id.).

On August 31, 2012, Plaintiff presented to a second orthopedist, Dr. W.L. Pinchback, Jr., M.D., for treatment of pain in both knees and her left ankle. (Id. at 369). Dr. Pinchback's examination revealed that Plaintiff had an "antalgic gait," some tenderness and decreased range of motion in both knees, and some intermittent discomfort in the left ankle. (Id. at 370). X-rays of Plaintiff's left ankle showed early degenerative changes, but Dr. Pinchback noted that "it is not severe." (Id.). X-rays of Plaintiff's left knee showed some narrowing of the patella femoral joint and associated osteophytes, but otherwise the joint spaces were fairly well

17

maintained.    (Id.).    X-rays of Plaintiff's right knee showed
severe degenerative arthritis involving the medial compartment
of the knee with bone-on-bone contact.    (Id.).    Dr. Pinchback
discussed with Plaintiff the option of having a total right knee
replacement; however, given her young age, he recommended
injections instead.    Plaintiff agreed.    (Id.).    Dr. Pinchback
did not recommend any treatment for Plaintiff's ankle and left
knee.    (Id.).    Subsequently, on September 28, 2012, Plaintiff
contacted Dr. Pinchback's office and advised that she wished to
proceed with surgery.    (Id. at 367).    On November 8, 2012, Dr.
Pinchback performed a total right knee arthroplasty.    (Id. at
363).    On November 30, 2012, Plaintiff returned for her three
week post-surgery follow up examination, and Dr. Pinchback noted
that she was "doing very well and making decent progress."    (Id.
at 364).    Dr. Pinchback instructed her to continue physical
therapy and return in three weeks.    (Id.).    Plaintiff's physical
therapist noted on that same date that Plaintiff's knee hurts
but "she feels better overall."    (Id. at 362).    On December 21,
2012, Plaintiff returned for her six week post-surgery follow up
examination, and Dr. Pinchback noted that "she is doing very
well;" "her wound is healing well;" and "she is making excellent
progress."    (Id. at 360).    Dr. Pinchback instructed her to
continue physical therapy and return in six weeks.    (Id.).
Plaintiff returned on February 1, 2013, three months after her

18

knee replacement surgery, and Dr. Pinchback noted that she was "doing very well and making excellent progress." (Id. at 355). Her examination revealed that she was flexing her knee about 90 degrees and extending it to almost 0 degrees; her surgical incision was well healed and non-tender; x-rays showed excellent position of her knee prosthesis with no loosening. (Id.). Dr. Pinchback discontinued physical therapy at that time and recommended that Plaintiff use a cane until her limp resolved and return in three months. (Id. at 356).

On April 1, 2013, one week after her administrative hearing, Plaintiff returned to Dr. Travis and reported that she was there for a "check up."[8] (Id. at 387). Dr. Travis found that Plaintiff had no swelling, no deformities, good muscle mass bilaterally, full range of motion of all joints, all muscles functioning well, and no atrophy noted, although there was still popping in the right knee with extension. (Id. at 388). Dr. Travis prescribed pain medication and instructed Plaintiff to return as needed. (Id.). Two weeks later, on April 16, 2013, Plaintiff returned to Dr. Travis with complaints of pain in her right knee, left foot, and left ankle, and Dr. Travis' findings were the same as the April 1, 2013, visit (no swelling, no

---

[8] Plaintiff's preceding visit to Dr. Travis had been July 19, 2012, the day after Dr. Travis completed the first MSS and CAP forms. (Tr. 390).

deformities, good muscle mass bilaterally, full range of motion of all joints, all muscles functioning well, no atrophy, and popping in the right knee with extension). (Id. at 385).

On May 14, 2013, one week before the ALJ issued his decision on May 23, 2013, Dr. Travis completed a second set of MSS and CAP forms. (Id. at 26, 378-79). The second MSS is substantially similar to the first, with the notable exceptions that Dr. Travis increased Plaintiff's ability to lift/carry from one pound to five pounds frequently; she decreased the frequency of any climbing, balancing, fine manipulation, and operating motor vehicles from occasionally to rarely; she noted that Plaintiff was using an assistive device; and she expressly based her opinions on Plaintiff's problems with restless leg, "severe [illegible] knee," morbid obesity, and chronic low back pain. (Id. at 353, 378). In addition, Dr. Travis' second CAP form is substantially similar to the first one that she completed on July 18, 2012, with the notable exceptions that she decreased the degree of pain that would be caused by physical activity from necessitating bed rest to only causing distraction from the task, and she increased the severity of side effects caused by medications from significant to severe. (Id. at 352, 379).

While Plaintiff makes much of the fact that the ALJ did not discuss the second set of MSS and CAP forms in his decision, given the substantial similarity with the first set of MSS and

CAP forms and given the lack of support in the record for Dr. Travis' opinions in both sets (as discussed below), the Court finds that any error by the ALJ in failing to consider the second set was harmless. See Battle v. Astrue, 243 Fed. Appx. 514, 522 (11th Cir. 2007) (unpublished) (errors are harmless if they do not prejudice the claimant); see also Ware v. Schweiker, 651 F. 2d 408, 412 (5th Cir. 1981) (remand would be a "wasteful corrective exercise" when "no further findings could be made that would alter the ALJ's determination" given the record as a whole).

In this case, the ALJ properly found that Dr. Travis' opinions set forth in the MSS and CAP forms completed on July 18, 2012 (that Plaintiff cannot perform any gainful activity because of the severity of her pain and exertional limitations)[9] are undermined by Dr. Travis' own conservative, infrequent treatment of Plaintiff, as well as her own examination findings. For example, on July 19, 2012, the day *after* she completed the first set of MSS and CAP forms, and again on April 1 and April 16, 2013, five months after Plaintiff's right knee replacement surgery by Dr. Pinchback, Dr. Travis found that Plaintiff had full range of motion in all joints; all of her muscles were

---

[9] While Dr. Travis does not specify in the first CAP form the source of Plaintiff's pain, the Court assumes based on the medical records that Dr. Travis is referring to Plaintiff's knee, leg, foot, and ankle problems. (Tr. 352).

functioning well; and she had no atrophy, no swelling, no deformities, and good muscle mass bilaterally. (Id. at 363, 385, 388, 390-91). These findings contradict the severity of pain and limitations expressed in both sets of Dr. Travis' MSS and CAP forms. (Id. at 352-53, 378-79).

In addition to being inconsistent with her own findings, Dr. Travis' opinions are inconsistent with the remaining substantial evidence in this case, including Dr. Pinchback's treatment notes on August 31, 2012, that the degenerative changes in Plaintiff's left ankle and left knee were not severe (id. at 370); his treatment notes on November 30, 2012, three weeks after Plaintiff's total right knee replacement surgery, that Plaintiff was "doing very well and making decent progress" (id. at 364); his treatment notes on December 21, 2012, six weeks post-surgery, that she was "doing very well," that "her wound [was] healing well," and that she was "making excellent progress" (id. at 360); his treatment notes on February 1, 2013, three months post surgery, that she was "doing very well and making excellent progress," that she was flexing her knee about 90 degrees and extending it to almost 0 degrees, that her incision was well healed and non-tender, that she had no swelling, that her x-rays showed excellent position of the knee prosthesis with no loosening, and that she no longer required physical therapy and could return in three months. (Id. at 355-

56).

In addition, Dr. Travis' opinions set forth in both sets of MSS and CAP forms are inconsistent with the opinions of consultative examiner, Dr. Stephen J. Robidoux, M.D., who evaluated Plaintiff on October 3, 2011, and found her to have no limitations whatsoever. (Id. at 321). Dr. Robidoux's examination findings include that Plaintiff had a "normal unaided gait," normal range of motion in all upper and lower extremities, full range of motion in her back, no muscle atrophy or weakness, and that she was able to squat and raise half way and had normal heel and toe walking. (Id. at 319-20).

Dr. Travis' opinions are also inconsistent with Plaintiff's reported activities of daily living which include cooking for her family, ironing, washing clothes, doing the dishes, taking care of her own personal needs, shopping, and attending church regularly. (Id. at 40, 202, 205-08). In addition, Dr. Travis' opinions in the two MSS forms that Plaintiff can only lift/carry ten pounds occasionally and one to five pounds frequently is directly contradicted by Plaintiff's statement to the Agency that she can lift twenty pounds. (Id. at 209). Moreover, Dr. Travis' opinions in both CAP forms that the side effects of Plaintiff's medications significantly limit her ability to work are contradicted by Plaintiff's own testimony that she has no side effects from her medications. (Id. at 43).

Based on the foregoing, the Court finds that the ALJ had good cause to assign little weight to the opinions of Dr. Travis set forth in the July 18, 2012, MSS and CAP forms. Moreover, because Dr. Travis' opinions set forth in the second set of MSS and CAP forms on May 14, 2013, are likewise inconsistent with the substantial evidence in this case, they would not have altered the ALJ's determination; thus, the ALJ's failure to consider them is harmless. See Battle, 243 Fed. Appx. at 522; Ware, 651 F. 2d at 412.

In addition, based on the evidence set forth in detail above, the Court finds that the substantial evidence in this case supports the ALJ's finding that Plaintiff can perform a range of light work, with the stated restrictions. Accordingly, Plaintiff's claim must fail.

> **B.  Whether the Appeals Council erred in failing to consider medical records submitted by Plaintiff based on the dates of the treatment records?**

Last, Plaintiff argues that the Appeals Council erred in failing to properly consider her treatment records from Dr. Pinchback dated June 7, 2013, through August 12, 2013, following the ALJ's decision on May 23, 2013. (Doc. 14 at 8; Doc. 12-1). Plaintiff argues that she submitted the additional medical records to the Appeals Council; however, the Appeals Council reviewed the records and held that they did not relate to the

period in question and, therefore, did not warrant granting review. (Doc. 14 at 8; Doc. 12-1; Tr. 1-4). The Appeals Council further declined to make the new evidence part of the record.[10] (Id.). Having carefully reviewed the entire record in this case, including the treatment records at issue, the Court finds that the new evidence submitted by Plaintiff does not provide a basis for changing the ALJ's decision in this case. Therefore, any error by the Appeals Council in its evaluation of that new evidence is harmless.

"With a few exceptions, the claimant is allowed to present new evidence at each stage of [the] administrative process." Ingram v. Commissioner of Soc. Sec. Admin., 496 F.3d 1253, 1261 (11th Cir. 2007). "Evidence submitted for the first time to the Appeals Council is determined under a Sentence Four analysis." Jack v. Commissioner of Soc. Sec., 2015 U.S. Dist. LEXIS 176372, *21, 2015 WL 10353144, *6 (M.D. Fla. Dec. 30, 2015), report and recommendation adopted, 2016 WL 706364 (M.D. Fla. Feb. 23, 2016) (citing Ingram, 496 F.3d at 1261). "The Appeals Council must consider new, material, and chronologically relevant evidence and must review the case if 'the administrative law judge's

---

[10] Although the Appeals Council declined to make the new evidence part of the record, this Court granted Plaintiff's motion to correct the record to include the new evidence. (Doc. 15). Therefore, Dr. Pinchback's treatment records at issue, which relate to Plaintiff's treatment after the ALJ's decision, are part of the record on appeal. (Doc. 12-1).

action, findings, or conclusion is contrary to the weight of the evidence currently of record.'" Ingram, 496 F.3d at 1261 (quoting 20 C.F.R. § 404.970(b)). "[W]hen a claimant properly presents new evidence to the Appeals Council, a reviewing court must consider whether that new evidence renders the denial of benefits erroneous." Id. at 1262. Evidence is material if it is "relevant and probative so that there is a reasonable possibility that it would change the administrative outcome." Caulder v. Bowen, 791 F. 2d 872, 877 (11th Cir. 1986).

In this case, Plaintiff properly submitted her subsequent treatment records from Dr. Pinchback to the Appeals Council, as they were created after the ALJ's decision dated May 23, 2013. Thus, they were "new." In addition, having reviewed the new evidence at length, the Court finds that the records do shed light on why Plaintiff was experiencing pain in her right knee during the relevant period; thus, they were "chronologically relevant." (Doc. 12-1). Therefore, the Appeals Council erred in rejecting Plaintiff's new evidence on the basis that it was "about a later time" and did not affect the question of whether Plaintiff was disabled on or before May 23, 2013. (Tr. 2). Nevertheless, as previously discussed herein, errors which do not prejudice the Plaintiff and which would not change the disability determination are harmless. See Battle, 243 Fed. Appx. at 52; Wright, 153 Fed. Appx. at 684.

In this case, the new evidence submitted by Plaintiff to the Appeals Council shows that on June 7, 2013, two weeks after the ALJ's decision, Plaintiff presented to Dr. Pinchback with complaints of right knee pain. (Doc. 12-1 at 8). Dr. Pinchback noted that Plaintiff had no swelling, instability, or muscle weakness of the knee, but she did have thick, tight scar tissue in the knee. (Id. at 9). X-rays further showed that the prosthesis was in excellent position, that Plaintiff had good bone mineralization, and that she did not have signs of reflex sympathetic dystrophy. (Id.). However, Plaintiff had "extensive adhesive capsulitis" in her right knee, and Dr. Pinchback recommended arthroscopic debridement and release of adhesions.[11] (Id.). On June 20, 2013, Dr. Pinchback performed arthroscopic debridement, synovectomy, and lysis of adhesions[12] in Plaintiff's right knee. (Id. at 10-12). On June 28, 2013, one week post surgery, Plaintiff's physical therapist noted that she was "doing well" and that she stated that her knee "is feeling better." (Id. at 14). On July 3, 2013, two weeks post

_____

[11] Adhesive capsulitis is "caused by tightening of the soft tissue and formation of scar tissue." See http://www.mountsinai.org/patient-care/health-library/treatments-and-procedures/adhesive-capsulitis-arthroscopic-surgery. Doctors perform arthroscopic surgery to break up, cut, and remove scar tissue to improve range-of-motion. Id.

[12] Lysis of adhesions is the process of cutting scar tissue within the body. See http://www.mountsinai.org/patient-care/health-library/treatments-and-procedures/lysis-of-adhesions.

surgery, Dr. Pinchback noted that Plaintiff "is doing very well," "has minimal complaints of pain and discomfort," and "has responded well to her physical therapy program." (Id. at 4). Dr. Pinchback's physical examination revealed that Plaintiff could extend her knee to 0 degrees and flex to about 90 degrees, that she ambulated "with a much better gait," and that she "appear[ed] to be more comfortable." (Id. at 5). Dr. Pinchback remarked that he "could see the pain relief in her face." (Id.). He instructed Plaintiff to continue physical therapy and return for a follow up in four to six weeks. (Id.). Plaintiff returned on August 12, 2013, and Dr. Pinchback noted, "[t]his patient is in today and doing well now." (Id. at 2). His examination revealed that she could flex her right knee about 90 degrees and extend it to 0 degrees. (Id. at 3). Dr. Pinchback advised Plaintiff that 90 degrees of flexion is considered acceptable but that he expected her to do much better with time and continued exercise. (Id.). He advised Plaintiff to "walk as much as she can" and return in three months for a check up. (Id.). This is the final treatment note from Dr. Pinchback in the record.

In sum, Plaintiff's new evidence shows that she formed scar tissue in her right knee following her knee replacement surgery on November 8, 2012, which caused her pain, and prompted Dr. Pinchback to recommend and perform arthroscopic surgery on her

right knee seven months later, on June 20, 2013, to debride and remove the scar tissue. However, nothing in the subsequent treatment records by Dr. Pinchback reflects that Plaintiff was disabled during the relevant period. (Id. at 363; Doc. 12-1 at 10-12). To the contrary, the substantial evidence in this case (specifically including Plaintiff's treatment records, the consultative report of Dr. Robidoux, the evidence of Plaintiff's activities of daily living, and the most recent treatment records from Dr. Pinchback), shows that Plaintiff is capable of performing a range of light work, with the stated restrictions.

Having determined that the new evidence presented to the Appeals Council, *i.e.*, Dr. Pinchback's treatment records from June 7, 2013, to August 12, 2013, does not render the ALJ's denial of benefits erroneous, any error by the Appeals Council in its evaluation of the evidence is harmless and does not warrant reversal. Accordingly, Plaintiff's claim must fail.

V.   **Conclusion**

For the reasons set forth herein, and upon careful consideration of the administrative record and memoranda of the parties, it is hereby **ORDERED** that the decision of the Commissioner of Social Security denying Plaintiff's claim for a period of disability and disability insurance benefits be **AFFIRMED.**

**DONE** this **28th** day of **March, 2016.**

                            **/s/ SONJA F. BIVINS**
                 **UNITED STATES MAGISTRATE JUDGE**